Next case is the Jeanes Hospital v. Secretary of HHS. Mr. Hallward... Hallward... Hallward-Dreemeyer, Your Honor. Dreemeyer, that's what I thought. May it please the Court, Hallward-Dreemeyer from Webster & Gray on behalf of Appellant Jeanes Hospital. With the Court's permission, I'd like to reserve three minutes of my time for... That request will be granted. Thank you. The Secretary's decision denying a depreciation adjustment to Jeanes Hospital amounts to what is in effect a retroactive amendment to the regulations that were applicable at the time of the merger agreement in this case. The Secretary would, in effect, preclude non-profit hospital mergers from qualifying for an adjustment to the estimated depreciation as a feature of the costs that were reimbursable under Medicare. The fundamental principle of the Medicare regulations that were in place at the time of this merger were that Medicare should pay its full share of the actual reasonable costs of providing services to Medicare beneficiaries, and that included the depreciation of depreciable assets. And Medicare would pay an estimate of that on a straight-line depreciation method over the course of time. But when there is a transfer of control of the assets, the regulations recognize that there is a need to make an adjustment, because straight-line depreciation is simply an estimate. So what's the language in the regulations that prohibits the Secretary's use of valuation stemming from a reproduction cost analysis to approximate fair market value? Well, there are a couple of things, I think, that prevent that. The first is that the essential term here and the basis of the Secretary's holding is that our merger did not qualify as a bona fide sale. And that breaks down into two things, an arm's-length transaction for reasonable consideration. And the Secretary is using the cost basis to determine whether there was reasonable consideration paid. But reasonable consideration is, as many court decisions have reflected, the fair market value of an asset. And fair market value is, in fact, defined in regulations as that price which is the product of diligent bargaining between unrelated parties. And that's what we have here. To the extent that the regulations contemplate that there would be some estimate of fair market value against which the product of the parties' negotiation would be assessed, it's a sales methodology. The regulation, and I'm citing to 413.134b2, which is the definition of fair market value. And it says that, quote, the price that the asset would bring, this is the definition of fair market value, quote, the price that the asset would bring by bona fide bargaining between well-informed buyers and sellers at the date of acquisition. Usually, the fair market price is the price that bona fide sales have been consummated for assets of like type, quality, quantity in a particular market at the time of acquisition. So the preferred estimate, if you're going to compare it to an appraisal, would be a sales base. What are other assets of this type selling for? Composite sales, right? Another indicator here that the Secretary's cost-based methodology is inappropriate is the reference to the particular market at the time of acquisition. That phrase reflects the fact that the market is what the buyer and seller are negotiating for in the context of other economic factors at the time. In Philadelphia at the time of this merger, there was extreme overbetting. This was, what, 1996? 1996, right, your honor. And there were many hospitals that were just shuttering their doors, in or some cases selling for a dollar. Including one that was just here. The predecessor of one that was just here. Exactly, your honor. Including another hospital that was in sight of James Hospital. So the regulations, again, indicate that you have to take account of the particular economic circumstance, the time in which the merger is taking place. In fact, the Secretary conceded that fact in the Braddock case. And this court held that the Secretary's determination that there had not been reasonable considerations based on a cost-method approach that had valued those assets at $13.5 million was clearly erroneous because it had failed to take account of economic obsolescence. The way that you would take and adjust a cost-based method to make it look like the sales method or income method, the kinds of things that actual buyers and sellers would consider in valuing an asset, you have to adjust for economic obsolescence. And in Braddock, that was the difference between $13.5 in cost-based and $3 million. The Secretary admitted that that was an error. This court recognized it as such and demanded. But here the Secretary tries to defend a cost-based appraisal that has not been adjusted for economic obsolescence. So it's inconsistent with the definition of fair market value. Can I interrupt for a minute? Because I'm interested in Judge Cruderay's question. Are you arguing that the regulation procludes the program memorandum's emphasis on the cost approach? No, Your Honor. No, Your Honor. So the cost approach is allowed then? But the cost approach as referenced in the program memorandum is actually for a different purpose than what the Secretary is using it for here. In the program memorandum, the Secretary emphasizes that the cost approach is preferred for the purpose of allocating the purchase price among the depreciable assets because the cost-based method allows for an individual asset-by-asset valuation, whereas the income-based method or a sales-based method when you're selling the lump sum of assets is going to give you a lump sum. And if I could put it another way, as I read it, what they're saying here is the cost approach among the three possibilities. The cost approach works better for this type of transaction. Isn't that fair? It works better for one aspect of what the Secretary has to do under the regulation, and that is to allocate the purchase price across individual assets so that the Secretary can know, okay, which asset has been under-depreciated, which asset has been over-depreciated. There has to be that allocation. And the regulations actually do reference the fact that in some instances there would be an after-acquisition, after-merger appraisal done in order to allow that kind of allocation. Let me ask you this. Is it your position that, number one, that the Secretary doesn't have this discretion because the regulations are clear as to which of the three methods should have been employed? Is that your point, or is it that I understand they have the discretion or the Secretary has the discretion? She just made a mistake. What the Secretary can't do is to adopt a rule that it is not reasonable consideration if the consideration paid is less than reproduction cost. The regulations, I was going to point to another feature of the regulation, and that is in 413.134G that actually distinguishes between fair market value and reproduction cost and acknowledges that fair market value, which is the price that's bargained for by unrelated parties, can be lower than reproduction cost. And so there are two features of the regulations that would indicate that certainly reproduction cost that isn't adjusted for economic obsolescence is not a permissible basis for determining whether there has been reasonable consideration paid in the transaction. The other thing that is inconsistent with the regulations from the Secretary's view is that the Secretary treated two features of the agreement as indicative that this was not an arm's-length agreement. One, that the genes had not obtained an appraisal before the roger, and two, that genes was negotiated to some extent with an interest of the ongoing hospital in mind. In Braddock, the court said specifically that neither of those factors is disqualified. What the court indicates in Braddock is more relevant to determining whether there was arm's-length negotiations. In fact, the hospital marketed itself to a whole host of potential buyers. Isn't that just part of the exercise of the Secretary's discretion? I mean, Braddock didn't conclude it. She considered it. Well, Braddock did do that, but also considered another feature of the program memorandum, and that was how the Secretary was defining related parties. And the court said that the Secretary's focus on the fact that some board members of the selling entity end up on the post-merger board, and that that's an indication that they were related, not unrelated parties. The court said that's inconsistent with the regulations because it would, in effect, rule out the merger provision as one basis for making an adjustment because almost always there's going to be that type of holdover of some board members. Likewise, certainly in the nonprofit context, the nonprofit board is required by law to be looking out for the interest of the hospital as it moves forward. So to suggest that the hospital board taking into account the strength of the hospital post-merger disqualifies that for an adjustment would likewise weed out of the regulation nonprofit mergers from consideration for adjustments, and that's never been the position of the regulation, so it is inconsistent. But I want to point to a couple of things here. I think it is extremely salient here that the Jeans Board did shop itself to at least six different potential parties to purchase the hospital. It initially entered into an agreement of understanding with another Quaker institution. It ultimately rescinded that, pulled out of it, and entered into an agreement with a non-Quaker institution. One of the differences between those two agreements is the fact that Temple agreed to pay Jeans money, cash, above the value of the liabilities that were being sued. Jeans pushed, pressed, according to the CFO of Temple, pushed repeatedly for an even greater payment to Jeans that would be in the control of Jeans after the merger. They asked for $5 million. Temple pushed back. Ultimately, the parties agreed on $1 million. That is the definition of arm's-length bargaining, and the product of that process is fair market value. I would like to reserve the remainder of my time. That's great. What evidence have you provided to show that the figure used for Jeans' depreciable assets was incorrect? That the $48 million is incorrect? It's the fact that there are a number of things. First of all, the appraisal that was done on the basis of an income method indicates that the true value of the assets as a building concern is $30.1 million. On the sales method, it was a range that started, I think, at $28. something million and up to $31. The appraiser said $30.1 is in the middle there. It's also the figure generated by income method. Those are the two methods that a buyer would be most interested in. Is the asset going to generate enough in income that will allow me to pay off what I assume is liabilities? We have that. Then there's the fact that the $48.8 million that the secretary uses is taken from the appraiser's cost method. The appraiser said specifically, don't rely on this as an indication of the actual value of these assets because it has not yet been adjusted for economic or functional obsolescence. That's exactly the feature of the appraisal that was deemed erroneous when the secretary relied on it in Braddock. It is erroneous now and it is inconsistent with the regulations. What do you want the number set at? What did you want the secretary to set the number at? $30.1 million for the depreciable assets. Then there are other issues in terms of there's a dispute about whether the assets that we don't trust. Thank you. Mr. McElwain. Thank you, Your Honor. Joel McElwain for the secretary. I'd like to begin with the arm's length transaction issue because that's the first element that Jeans Hospital needs to meet. I think that's dispositive even before we reach any questions of reasonable consideration. To take a step back at the overall statutory structure, the secretary has a statutory duty to pay providers only for the reasonable and actually incurred costs. Depreciation is one of those costs and so providers are paid on a depreciation schedule. At times, an adjustment would be appropriate to true up that schedule to a showing of what the actual costs of depreciation have been. A bona fide sale can be one of those circumstances where you would make the adjustment, but you need to make a very strict showing that it truly is a bona fide sale. Again, to back up the secretary's obligation to pay only for actual and reasonable costs. The secretary is opposed to conditions. A bona fide sale has to be an arm's length transaction between parties who are motivated to negotiate selfishly in their own interests and are well informed as to the circumstances of the transaction. All right, let me just stop you there because I do think counsel for Jeans makes an intriguing argument. You just said, I don't know if it was quoted, but he has to bargain selfishly, right? Yes. That seems to prevent any non-profit from ever getting paid for this, right? Because non-profits by their charter are required to fulfill a mission and that mission frequently involves activities that are to the financial detriment of the hospital, serving the poor, et cetera, et cetera. Well, the fact that non-profit hospitals do serve the poor is very relevant to the valuation that they're voluntarily foregoing income. That's when we get to the reasonable consideration point. But I mean, why isn't it an arm's length point? I mean, I thought this case, the record, as I recall, indicated board minutes where the Jeans board is in fulfilling their financial duties as board members of this hospital are very concerned about fit, and fit has to do with the mission. And those sorts of discussions are sometimes at odds with what's in the pure, peculiar interest of the institution. And that's exactly our point. It's entirely praiseworthy. It's entirely a good thing for the board to take those considerations into account. So a non-profit that's fulfilling its financial duties will never get reimbursed for these sorts of things? No, I wouldn't say that it would be impossible for a non-profit hospital to meet this and to back up again. 413.134 is the regulation that says a burgeoning party can, if it meets the requirements of a bona fide sale, that can be evidence that the value is different than what the depreciation schedule provided. And so we'll make the adjustment. If it really is a bona fide sale, you really are negotiating selfishly. Now, 413.134 was now K, was phrased in terms of capital stock, which possibly would create the implication that only provided, applied to for-profit providers and non-profit providers would be totally out of luck. The secretary issued a proclamatory saying, no, no, no, no. This does apply also to non-profit providers, but it applies on exactly the same terms to non-profit providers as it would to for-profit providers. If you can show that. So the debate at the board, I mean, it's not hard to conceive. Half the board is sitting there saying there are millions of dollars we're going to leave on the table if we don't take the best offer available, even if it's from the Darth Vader of the hospital industry. And then the other half of the board is saying, wait a minute. We're an equitable institution. We have a mission. We have a story of history. We do all these good things, et cetera, et cetera. What do they understand, do they understand, don't? No, I mean, they're doing the appropriate thing. If they're concerned about the mission of this hospital that they are supposedly divorcing themselves from going forward, it's a good thing to have that concern. But what they're not doing is trying to maximize the value they're getting out of the transaction. And when you don't have one party on one side of the transaction doing that, you don't have the possibility of getting a bumper because of what the value is. It seems to me that the points that you focused on, a lot of what the board, certain board minutes, board minutes from four specific board meetings that talked about preservation and the Quaker mission, those are what you primarily focused on in the administrator's decision, ignores the realities of the health care market in 1996 in Philadelphia, the excess beds, the ensuing what was perceived to be the difficult financial position that a lot of hospitals were in in 1996, non-financial difficulties, not the fact that they crumbled in 97 and 98, but non-financial difficulties. There weren't any buyers in this marketplace. I disagree with that. Okay, you disagree with that. I do. Page A727 of the record, board minutes of August 12, 1994, when the process was beginning. Jeans was considering eight possible suitors, two of them were for-profit, six of them were not-for-profit. The board minutes report that the board dismissed early in the process because of the perceived conflict between their proprietary interests as insurers and the not-for-profit mission of Jeans. The two for-profit enemies were not even considered as potential partners. They thought about this range of six other partners who were all not-for-profit, ultimately narrowing down to Penn and to Temple, ultimately choosing Temple. In 1996, I don't even know who those two for-profit enemies were. They weren't major players in this market. The major players in this market, besides Ahrefs in 1996, were Penn and Temple and Jefferson, and they negotiated with two of the three. But the point is that these for-profit enemies were rejected, weren't even explored as possible partners, precisely because they were for-profit. So they forewarned the possibility of looking for somebody. Certainly, to say that the mere fact that they ignored for-profit entities clearly ignores the mission, which I don't think you can clearly ignore, particularly for non-profits. Non-profits all have a mission, and to be acquired by a for-profit mission, or for a for-profit hospital, I think it's easy to argue there's a clear conflict with that. This is exactly the issue that this court addressed in Einstein. The same fact pattern was before the court in Einstein, and this court held where the supposedly selling entity was negotiating for benefits for the hospital going forward, while entirely laudable, entirely consistent with the for-profit mission. They were doing everything they should have been doing. Nonetheless, that showed that they're not negotiating an arm's length. They're not trying to extract money away. They're trying to benefit the hospital that was going to the entity. I think that's seizing, as I said. You seized on records of four meetings. I think that's seizing on one principal issue and ignoring all the other realities. I don't think so, because the first question we have to get over is, was there an arm's length transaction? Were they trying to extract value? If they weren't doing that, that's the end of the case. The whole notion that you're going to exclude for-profits from the arena of potential suitors is to a certain range right there. I think that's exactly right. It shows that you're not motivated by profit. You're motivated by things other than profit. That's exactly right. That's eliminating all non-profits. They want to remain non-profits. No, and that's the point I wanted to return to. It's a little bit hard to imagine, I will acknowledge, how genes and these facts could be satisfied for 135134. But let me suggest an alternative hypothetical. You have Temple, which now owns the New Jeans Hospital, and also runs other hospitals, and they're all set up as separate subsidiaries. Time goes forward, 96, 97, 98. They decide it's now working out with genes. The best thing for us to do for our overall mission is sell off genes, use the profits for Hospital A and Hospital B that they're also running. Temple is a non-profit entity, but that would be a case where they really are trying to extract fair value, maximum value that they can get to use the money for other parts of their enterprise. That would be an example of how a non-profit entity would be acting like a for-profit. So the non-profits that some of us are aware of, that seem to have as much of a cap as Ben and JP Morgan, they win. They get the benefit. And the ones that are more mission-centric, that are more religiously affiliated, they lose. That's sort of the reality. And again, it's not a question of moral judgment. It's not a question of the equities. The Medicare program doesn't reward money to hospitals for doing a nice thing that you know about. But the specific purpose here is to reward people for their costs. You know, I could cite to you another body of law, which really doesn't, isn't in this case. But there are state laws that impact what non-profits can do, which preclude their ability to sell to for-profits. And nowhere in this analysis did you take that into consideration. It doesn't matter. Well, it does matter, because you're seizing on a couple different points to say it wasn't an arm's length. And I'm saying to you that there are a lot of factors which the Secretary has not taken into consideration. If I told you there was a law in Pennsylvania that a non-profit had to have a move to another entity approved by the State Attorney General, would you take that into consideration as a factor? If you had to gain approval, then you work with the legal regime you have. But the bottom line, the ultimate factual question is, are they trying to maximize value? Because the Secretary's held in this courtroom in Einstein that only when you have two parties trying to maximize value, do you arrive at a number that tells you that you have to run out of time, and we took some of your time. I don't know why you're fighting so hard on this issue when you can win on the second problem. Maybe you can read the court that you really don't have a lot of support on that first issue. You don't have to win everything. I love winning on everything. I hope to win everything. But on the second issue, we went as easily there as well. Maybe easier. Sure. The Administrator reasonably found that the value, or at least what the record could support a finding of, was a value of $103 million that was exchanged for about $67 million. That's not an exchange for a fair value. That doesn't meet the reasonable consideration requirement. The numbers seem to be very strong for you, except I think maybe we have to deal with the obsolescence argument. Because your numbers don't look so strong for you if that needs to be taken into account. Well, it's separating out two issues. One is they're arguing that they should have used the income approach, and the second was their— What about the point of structural obsolescence? They have a point on a different record. And Brad and the provider did have a point. What you have here is an appraisal where the appraiser came out and said, here is the cost, here is the physical depreciation, and we are estimating a country number of $10 million that needs to be further depreciated by for economic obsolescence. And the problem with Brad was the administrator just missed another record, just thought that the first number applied. It was just a simple factual mistake. And so it was remanded for the administrator to reconsider. Here, the appraiser said, yes, we think that there should be an adjustment for economic obsolescence. But they didn't attempt to quantify it at all. So it's a burden issue. It's a burden issue. If they marshaled the facts, et cetera, et cetera, then you would have had to give them a credit, assuming that the obsolescence argument was well conceived. You would have had to offset that. Just as an advocate for the secretary, I would hesitate to say we would have had to. Why not? It seems fair. I mean, if they made the right showing and the evidence compelled that result, then yes. I'm not sure that it's their burden. They're trying to put the burden on you and say you erroneously failed to account for obsolescence. And the only job is their burden to get the appraisal that supported that offset. And there's one additional issue, the sort of threshold issue, before we get to the numbers, which is that the administrator noted this is an after-the-fact appraisal. I don't need to consider this at all. But going through the fiction that this is the right number that the parties were thinking of in 1996, I'll go through those numbers and say here's what they said for the cost approach. And they still haven't met their burden, even with those numbers. So, essentially, it's two points. One, the administrator was entitled to disregard the appraisal entirely. And second, even if you take the appraisal upon the right approach, which is the cost approach, which is the most appropriate method for nonprofit entities, you have a number that takes you $30 million or more higher than what was the supposed consideration, which is coincidentally right about the number that the Einstein Court found to be highly indicative of the lack of a reasonable consideration, $32 million. I want you to comment for a moment, if you would, on your adversary's invocation of the different regulations as showing why the method used by the secretary was in court. There are circumstances where something other than the cost approach, something other than cost-approved physical depreciation would be appropriate. But what the program in learning tells you is specifically in the context of nonprofit entities, the cost approach is better than the income approach because, as we previously discussed, nonprofit entities are voluntarily forgoing income. So the income approach just doesn't tell you all that much about what the real value of the entity might be. And that's why, to the extent that all entities have their flaws, you can pick out flaws in the cost approach all day long. But in the overall circumstances, in the specific context of nonprofit entities, the cost approach is better than the income approach. Or at least, actually, reasonably so found in the program. Okay, so his point that, pursuant to the regulations, the secretary essentially made a mistake, your rejoinder is, under the program memorandum, the secretary is merely invoking her discretion and picked this cost approach because, in the nonprofit context, it's the superior approach. She didn't reasonably construe the regulations specifically to the context of nonprofit entities to get to this result. And under Thomas Jefferson University versus Shalala, that's over the other post-office. Okay. Thank you, Mr. McEvoy. Mr. Holward. Thank you very much, Your Honor. A couple of points I would like to focus on, the reasonable consideration point. First of all, the secretary's program memorandum that prefers the cost approach was not adopted until 2000, which is four years after the transaction at stake here and also four years after the appraisal that was done here. Is there any authority for the proposition that that can't be utilized? You cannot apply retroactively a rule that would disqualify you categorically. I think his point's a little different. At the time that the decision was made, is there anything stating that you can't invoke the cost approach? Excepting for a moment your point about when it came into being. Georgetown versus Bowman makes clear that the secretary cannot adopt retroactive amendments to the rules. She couldn't even do that through notice and comment. She certainly can't do that through a program memorandum that hasn't gone through notice and comment, and that is effectively what has happened here because at the time this transaction took place, there was no requirement that it be evaluated by the cost approach. There was an appraisal done that utilized the two values that would most likely be of salience to a purchaser, the income value and the market value in appraisal. An appraisal was done by jeans after the transaction? Yes, because the... So you can't argue that that appraisal informed the negotiations for the transaction. But when it was done, it was done for the purpose that the regulations specify. The regulations provide, at the time in 96, provide for the completion of an appraisal to allow for the allocation of the purchase price across assets, and that was the purpose for which the appraisal was done. The appraisal confirmed that there had been... It was two purposes. It also was to confirm what had been, in the view of jeans, that had to apply for the adjustment. The value of the depreciable assets in the transaction. But what the secretary is trying to do, and this is not at how much is jeans entitled to as an adjustment. This is at the threshold. Did jeans actually undergo a change of control at an arm's length, bone-to-fetal transaction? Well, let's assume we're with you on that. Right. So it's arm's length, and the secretary says, well, this isn't done for reasonable consideration because it was less than the unadjusted, the cost, reproduction cost, unadjusted for economic obsolescence. That is arbitrary and capricious. And our example in the brief of the Loveyville factory illustrates that. The cost approach is the least indicative of the reasonable consideration that someone would pay for an ongoing enterprise. The reasonable consideration for an ongoing enterprise would be most likely generated, as the regulation provides, by the sales approach. What are similar assets being sold for? As Judge Fischer rightly pointed out before, in 1996, because of the overbearing problem in Philadelphia, other hospitals were willing for virtually nothing. Jeans obtained very considerable consideration for itself. Thank you, Your Honor. Thank you. Thank you. We thank both counsel for an excellent argument and a well-proved case. And we'll take the matter under advisement.